NEW YORK PRACTICE REPORTS. 193

Dry Dock, &c., Railroad Co. agt. The New York, &c., Railroad Co.

## SUPREME COURT.

THE DRY DOCK, EAST BROADWAY AND BATTERY RAILROAD
COMPANY, appellants agt. THE NEW YORK AND HARLEM
RAILROAD COMPANY, THE EAST RIVER FERRY COMPANY AND
OLIVER CHARLICK, respondents.

JAMES M. WATERBURY AND THE EAST RIVER FERRY COMPANY
agt. THE DRY DOCK AND EAST BROADWAY AND BATTERY
RAILROAD COMPANY, AND THE NEW YORK AND HARLEM
RAILROAD COMPANY.

This is an appeal by the plaintiffs in the first above entitled action, from the
decision of the special term of this court, as reported in 30 *How. Pr. R.* 39.

It was there *held* that by an act of the legislature in 1826, the title to all lands four
hundred feet east of low water mark on the shore of the East river, was vested
in the mayor, aldermen and commonalty of the city of New York.

That the city of New York had a right under that act, to convey any of the lands
embraced within its provisions. And having in 1847 conveyed certain lands
under water east of First avenue, except a space of one hundred feet in width
eastward from First avenue, and in continuation of Thirty-fourth street, to the
Farmers' Loan and Trust Company, with covenants by the grantees, their suc-
cessors and assigns, to fill up the same, and erect and make a good and suffi-
cient wharf, avenue or street, one hundred feet in width, from First avenue to
Avenue A, and keep in good order said street, wharf and avenue, which should
thereafter continue to be a public street of the city; and the Farmers' Loan
and Trust Company having conveyed said premises, subject to the same pro-
visions and conditions, to the East River Ferry Company and James M. Water-
bury, who are engaged in filling in the land owned by them, including said con-
tinuation of Thirty-fourth street, one hundred feet wide to Avenue A, in pur-
suance of the original grant from the corporation:

*Held*, that upon the completion of the work, and when the land was filled in,
graded, regulated and paved, for the purposes of a public street, it was the
intention of the city, who made the conveyance, to dedicate it as one of the
public streets of the city. But it was no part of the contract that it should be
thus appropriated while the work was in progress, and during that period the
title to the property remained in the corporation, while the right to its posses-
sion and control, and its use for the purposes intended, was in the grantees who
had contracted to perform the work, until its completion, its adaptation to the
public use, and some act done evincing the entire fulfillment of such contract,
and discharging the parties who had agreed to perform the work, and from the
obligations imposed upon them: Therefore, until the fulfillment of such con-
tract, and the finishing of the street, no railroad company had any right to
enter upon the premises and disturb the possession of the grantees. And
upon their doing so, a remedy existed by injunction.

The *general term* on this appeal *held*, that it appeared from the papers in this case,
that Thirty-fourth street, or the strip of land one hundred feet wide to a point

Dry Dock, &c., Railroad Co. agt. The N. Y. and Harlem Railroad Co.

about two hundred and seventy-seven feet easterly, from the easterly side of First avenue, and to which the ferry house had been removed, had been so far filled out and graded as to be constantly used by the public in going to and from the ferry, and for common highway purposes generally. Therefore, either of the railroad companies had a right, as to Waterbury and the ferry company, to construct and extend their tracks through and over Thirty-fourth street, as far easterly as the grading or condition of the street would permit. The injunction at the suit of Waterbury and the ferry company, restraining the railroad companies, should be vacated with costs. (CLERKE, J. dissenting.)

It was also held by the special term, that by the act of 1849, The New York and Harlem Railroad Company, were authorized to construct a branch from their railroad to the East river, to such point as might be designated and permitted by the corporation of the city of New York; and that in March, 1864, the corporation selected a point on the East river to which the said railroad might be constructed, and gave the requisite permission to extend their road through Thirty-fourth street to the East river:

Held also, that the act of 1849 must be considered in connection with the permission granted by the corporation in 1864; and as the privileges granted were bestowed prior to the act of 1860, under which the Dry Dock, East Broadway and Battery Railroad Company claim to act, the New York and Harlem Railroad Company have precedence in using the space in continuation of Thirty-fourth street, when completed.

The general term on this appeal held, that before the Dry Dock, East Broadway and Battery Railroad Company actually commenced taking a qualified possession of the center or middle of that part of Thirty-fourth street, or the strip of land, by locating and constructing their extension, either railroad company had a right to make their extension through or along the center or middle of the street or strip, to the exclusion of the other from that particular location. There was no principle upon which the court could favor the right of either company thus to locate their extension, to the exclusion of the other, before any actual attempt at such location.

But the Dry Dock, East Broadway and Battery Company, by first actually taking a qualified possession of the center or middle of the street or strip of land, by locating and constructing their extension as far as they did, until interfered with by the agents or servants of the Harlem Railroad Company, acquired the right to complete the construction of, and to operate their extension to the ferry, or as near to it as the condition of the street or strip of land and the convenient operation of the ferry would permit, to the exclusion of the right of the Harlem Railroad Company to interfere in any way with the construction or operation of the Dry Dock, East Broadway and Battery extension as thus located. The order in this action between the railroad companies, and in which Oliver Charlick and the ferry company are parties defendants, should be reversed, and the injunction which was vacated by it restored and continued, with costs to the plaintiffs, to be paid by the Harlem Railroad Company. (CLERKE, J. dissenting.)

New York General Term, June, 1866.

Before BARNARD, P. J., SUTHERLAND and CLERKE, Justices.

THE Dry Dock, East Broadway and Battery Railroad Company, on 18th June, 1865, laid rails in Thirty-fourth street east of First avenue, which were almost immediately

torn up and destroyed, and the New York and Harlem Railroad Company proceeded to lay down their own tracks. The Dry Dock Company then commenced suit, and obtained injunction against the Harlem Railroad Company and Oliver Charlick, restraining them from interfering with the Dry Dock Company, in the use of the tracks laid upon the location adopted by them. The East River Ferry Company and James M. Waterbury then commenced suit against both railroad companies, and procured injunctions to restrain them from constructing tracks upon a space in dispute one hundred feet wide, which they had filled in, pursuant to grant to Farmers' Loan and Trust Company.

Motions were made to dissolve both injunctions, which were heard before Justice MILLER, at Hudson, on 7th July, 1865, who dissolved the injunction obtained by the plaintiffs in the first suit, and continued the injunction obtained by the ferry company. (*See full statement of the case*, 30 *How.* 39.)

The Dry Dock, &c., Railroad Company appealed from both orders to the general term.

> H. W. ROBINSON, *counsel for Dry Dock, East Broadway and Battery Railroad Company.*

The main question presented in these cases is as to the right of the Dry Dock and Battery Railroad Company to maintain and use a railroad track, which they had constructed on the 17th and 18th days of June, 1865, and laid from their railroad track in the Fist avenue, easterly through Thirty-fourth street, towards the East river, to a point two hundred and seventy-seven feet of the easterly side of First avenue (*Case in first suit pages* 3 *to* 5), under the authority conferred by the act passed April 17, 1860 (*chap.* 512), of which grant they are the assignees.

This act authorizes the grantees and their assigns "to construct, maintain and operate a railroad," upon various routes, and among others (*Sess. Laws* 1860, *p.* 1039), "through and along First avenue, with a double track to

Thirty-fourth street; thence through and along Thirty-fourth street, with a double track to Avenue A," &c.

Under it they had constructed a double railroad track in Thirty-fourth street, east of First avenue, which the defendants, or some of them, on the night of the 18th June, 1865, destroyed and broke up, and the New York and Harlem Railroad Company immediately entered on the same track, and extended a railroad on and over the sleepers and ties laid by the Dry Dock, East Broadway and Battery Railroad Company, and on the 19th began running cars thereon, and rendered the track laid by the latter company useless. (*Case in first suit, p.* 8.)

Upon a complaint and affidavit presenting these facts, an order was granted by Judge INGRAHAM, requiring the defendants to show cause why they should not be enjoined (as prayed for the in the complaint), from interfering with the plaintiffs constructing, maintaining and using their railroad tracks upon the location in and upon which the railroad structure and tracks of the plaintiffs were laid and placed, in Thirty-fourth street and First avenue, previous to and on the evening of the 18th day of June, 1865, and a temporary injunction was granted to the same effect, which also restrained the New York and Harlem Railroad Company from using or interfering with such track and structure. (*Case, first suit, p.* 11.)

This order the New York and Harlem Railroad opposed by affidavits, setting up in defense the provision of the act of 1849, chapter 75, section 3, which authorizes them "to construct a branch for their road to the Hudson river, authorized by their original charter, from any point upon that road north of Twenty-seventh street, to any point on the Hudson river which may be designated and permitted by the corporation of the city of New York, and also to construct a like branch from the said road *to the East river*, at such point as may be designated and permitted by the corporation of the city of New York."

On the 8th day of March, 1864, the corporation by resolution, granted them permission "to extend this road from

the Fourth avenue, with double track through Thirty-fourth street to the East river." Under this authority they had extended "a double track from the Fourth avenue easterly through Thirty-second street, Lexington avenue and Thirty-fourth street, to the easterly side of the First avenue." They allege that *they intended, and had made preparations* to pro-long and extend their track further east, to the new ferry house on the East river, at the foot of Thirty-fourth street, when, as they allege, the Dry Dock, East Broadway and Battery Railroad Company intruded and laid tracks on the site they intended to occupy, and intentionally interfered with their plans (*Case, first suit, p.* 15); that on this space east of First avenue, there is no room for more than one set of double tracks, or for more cars than theirs (*p.* 16); that it would be utterly impossible to locate a railroad to the ferry in any other place than the location selected by them (*p.* 17), and from these circumstances claim prior and exclu-sive right to occupy the *locus in quo* for railroad purposes.

The East River Ferry Company were the assignees of a lease from the corporation of the right of running a ferry "from the foot of Thirty-fourth street across the East river, to Hunter's Point, L. I.," and claim to be the owners in fee of one hundred feet square at the north-east corner of the block east of First avenue, between a line in continuation of the northerly line of Thirty-third street and a line in con-tinuation of the southerly line of Thirty-fourth street and the exterior bulkhead line, as established by law, and also of the south-east corner, about one hundred feet square of the block, north of the line in continuation of the northerly line of Thirty-fourth street and southerly line of Thirty-fifth street, and east of First avenue.

James M. Waterbury, one of the plaintiffs in the second suit, claimed to be the owner in fee of the block of ground east of First avenue, between a line in continuation of the northerly line of Thirty-third street and a line in continua-tion of the southerly line of Thirty-fourth street and the exterior bulkhead established by law, except the one hun-

dred feet square, the north-east corner thereof, owned by the East River Company.

The title of both the East River Ferry Company and James M. Waterbury was derived through chapter 58, of laws of 1826, granting four hundred feet from low water mark, and a deed of this and other property executed by the mayor, aldermen and commonalty of the city of New York to the Farmers' Loan and Trust Company, dated January 29, 1847. (*Set out on page* 24, &c., *of Case, in second suit.*) The premises assumed to be conveyed by that deed were then covered by water, and lay below high water mark on the East river, which ran some one hundred and sixty-sevenths of two hundred and forty-six feet west of the present extension of First avenue at Thirty-fourth street. Thirty fourth street to the width of one hundred feet, and other streets and avenues, as laid out on the map of the commissioners appointed under the act of 1807, were protracted and extended over the premises conveyed, into the East river to the east side of Avenue A ; and the title to all those streets and avenues was reserved in the corporation of the city of New York. (*See map.*) The deed contained a covenant on the part of the grantees, for themselves, their successors and assigns, that they would " within three months next after they should be thereunto required by the said party of the first part, or their successors, but not until they should be thereunto required, at their own proper cost " (*page* 28, *Case in second suit, fol.* 99), build certain wharves or streets, and among others, " a good or sufficient wharf, avenue or street, one hundred feet in width, separating and lying between the third and fourth above described premises (the blocks between Thirty-third and Thirty-fourth streets, and between Thirty-fourth and Thirty-fifth streets), extending from First avenue to Avenue A, being a portion of the intended new street called Thirty-fourth street, as the same is designated on the map hereunto annexed (*fol.* 101) ; also a like wharf, avenue or street, one hundred feet in width, " extending from where high water line crosses Thirty-fourth street to First avenue, being a portion of the intended new

street called Thirty-fourth street " (*fol.* 104), " in front of the entire width of the southeasterly end of Thirty-fourth street" (*fol.* 108); also, " from time to time, and at all times here-after, uphold and keep in good order and repair, all such streets, bulkheads, wharves and avenues " (*fol.* 110); and that the said streets and avenues should " forever thereafter con-tinue to be and remain public streets and avenues and high-ways, for the free and common use and passage for the inhab-itants of the said city, and all others passing and repassing by and through and along the same, in like manner as the other public streets, avenues, bulkheads and wharves of the said city, now are or lawfully ought to be" (*fol.* 111). And in case of default in these covenants, the parties of the first part might do the work, and recover from the grantees the cost thereof, " or sell and dispose of the whole of the said hereby granted premises, or any part thereof, at public auction " (*fols.* 112, 113), or re-enter and grant the same to any other persons (*fol.* 114). The grantees also cove-nanted not to build such wharves, avenues and streets, or any part thereof, or make the land in conformity to such covenants," until permission for that purpose should be first had and obtained from the corporation (*fol.* 116).

In case of breach of covenant, the deed was to become null and void, and a right of re-entry was given (*fol.* 122).

There is no pretense that the corporation has ever required the grantees or their assigns, to fill in Thirty-fourth street (*see complaint in second suit, fol.* 12), but James M. Water-bury and the East River Ferry Company, claiming and hold-ing under this deed, had, of their own accord, filled in this space of one hundred feet wide known as Thirty-fourth street, and graded and prepared it for public travel thereon as a public street, to the ferry house and landing at the foot of Thirty-fourth street, about three hundred and ten feet easterly from the First avenue (*page* 4 *in first suit*), but the filling in and grading was not entirely completed. They claim also to have been engaged in the construction of a sewer in some part of Thirty-fourth street east of First ave-nue; that the laying of the railroad tracks interfered with

the construction of this sewer, and hindered and impeded them in the work of filling in, regulating and paving the said space, and delayed and embarrassed them in complying with the terms of said covenant. (*Fol.* 134, *first suit ; fol.* 27, *&c. in second suit.*) For this cause the second suit was commenced by James M. Waterbury and the East River Ferry Company, and an injunction obtained against the Dry Dock, East Broadway and Battery Railroad Company, and the New York and Harlem Railroad Company (*page* 13, *of Case in second suit*), which the first named company on their verified answer, moved to dissolve (*fol.* 46).

After a hearing of all the parties upon these motions, before Judge MILLER, he made an order in the first suit dated July 7, 1865, denying the continuance of the injunction granted by Judge INGRAHAM, and dissolving the temporary injunction (*page* 40), and made an order in the second suit (*page* 35, *second suit*). granting an injunction against both railroad companies.

Appeals are taken by the Dry Dock, East Broadway and Battery Railroad Company from these orders.

· I. The passage of the act authorizing the construction of the railroad of the plaintiffs (in the first action), notwithstanding the objections of the governor by the necessary vote of two-thirds of the members present (*Const. art.* 4, § 9), appears from the statute book (*Laws of* 1860, *ch.* 512). The constitutionality of the act, or one entirely analogous, was fully sustained by the court of appeals in *The People* agt. *Kerr* (27 *N. Y. Rep.* 188).

II. The franchises thus conferred, are by the act expressly made assignable without limitation as to the assignee (*Bank of Middlebury* agt. *Edgerton*, 30 *Ver.* 182), and the plaintiffs having been incorporated under the general railroad act, for the purpose of operating a railroad over the same routes, became and are the assignees of the rights and privileges thereby conferred, and had for a year before suit brought, been exercising these franchises and running their cars below Fourteenth street. Each and every of the city railroads in the city of New York (not including the Harlem and Hud-

son), are incorporated under the general railroad act, to exercise franchises granted private individuals, which are held and enjoyed by the corporations thus formed, as assignees of the private grantees. The regularity of such an incorporation cannot be collaterally questioned (*Buffalo and Albany R. R. Co.* agt. *Cary,* 26 *N. Y.* 77).

The objection of the defendants, that no consent of the corporation of the city of New York was ever given to the construction of this railroad, was taken in the *New York and Harlem Railroad Co.* agt *The Forty-second and Grand street Ferry Co.,* under precisely similar circumstances, and over-ruled. (*See opinion of General Term,* BARNARD, *J. delivering. opinion of majority of the Court in N. Y. Transcipt, June 27th,* 1864.)

(*a*) It was there held:

1. That the New York and Harlem Railroad Company, and the other parties to these controversies (who all stand in precisely similar situation as that company. did in that case), did not stand in a condition to raise the objection; that the party whose assent is necessary, is the only party who can take advantage of the want, except where the want of it has the effect of making a corporation exceed its powers, in which excepted case the attorney general can alone take proceedings for such usurpation, since the want of such consent works no private injury to the corporation, or to the individual owners of property or to tax payers, under decision in *The People* agt. *Kerr.* (*And see Drake* agt. *Hudson River Railroad Co.* 7 *Barb.* 508, 558.)

2. That all control of the corporation of New York over city railroads to be constructed in New York, was abrogated by the act of 1860, chapter 10, and it was unnecessary to procure their consent, as had been provided in the general railroad act (§ 28, *sub.* 5).

3. That the Dry Dock, East Broadway and Battery Railroad Company (occupying precisely the situation of the Forty-second and Grand street Ferry Railroad Company) " stand in the same position as if the legislature had granted the right to them, for the legislature granted it to certain

persons and their assigns, and the defendants are the assignees."

(b) The prohibition in the 4th section of the act of April 17th, 1860, chapter 512, against the mayor, &c., giving assent to, or allowing any company claiming to derive authority under the general railroad act, " to construct any railroad in or upon any or either of said streets or avenues, and from doing any other act to hinder, delay or obstruct the construction or operation of the railroad as herein authorized," evidently has relation exclusively to any other railroad, the authority to construct which was derived exclusively under that act, as distinguished from the railroad authorized by this act.

The plaintiffs (in the first suit) having the authority of the act of 1860, have no occasion to appeal to any consent of the common council to give effect to their statutory powers, nor do they rely upon any powers conferred by the general railroad act, except for their mere corporate capacity.

(c) Their corporate powers and ownership of the railroad, authorized by chapter 512 of the laws of 1860, are fully recognized and affirmed by chapters 866, 868, 883, of the laws of 1866.

III. The plaintiffs (in first suit) having full authority to construct their railroad from First avenue "through and along Thirty-fourth street, with a double track to Avenue A," had a perfect right to lay their tracks in the manner described in the pleadings and affidavits. They did not run upon any railroad track previously laid by the New York and Harlem Railroad Company. They had no reason to abstain from doing what the law allowed to them to do, because they might have anticipated that that company would in time desire to occupy the same location. Whatever rights or benefits might accrue from prior occupation, they were entitled to secure to themselves. "Prior est tempore, potior est jure." If it be assumed that the Harlem company had a right to extend their tracks further east, from the course they had previously pursued in monopolizing the main portion of Thirty-fourth street for fifty feet east of

First avenue, these plaintiffs had no reason to expect from them any courtesy or forbearance in pursuing a like course in regard to the rest of the street wherever they choose to extend their tracks.

It was to this monopolizing act that Mr. Richardson referred when he made use of the common expression that "he would show them a trick worth two of that." While it is conceded that if the New York and Harlem Railroad Company rightfully extend their track further east, the doing so could not be justly designated a "trick," neither can the exercise by the Dry Dock Company of a similar lawful right, be so stigmatized.

IV. The New York and Harlem Railroad Company have no right to extend their road east of the original high water mark on the East river, which was west of First avenue.

1. The act of 1849, under which they (on obtaining the designation of the route and the permission of the common council) were authorized to extend their track " to the East river," made the margin of the river at high water mark, as it then existed west of First avenue, the boundary line and extreme point of extension.

It is the general rule that grants bounded by tide water, only extend to high water mark. (*Halsey* agt. *McCormick*, 3 *Kern.* 297 ; *Lansing* agt. *Smith*, 4 *Wend.* 29 ; *Canal Com.* agt. *People*, 3 *Wend.* 443 ; *Loundes* agt. *Dickinson*, 34 *Barb.* 586 ; *Gould* agt. *H. R. R. Co.* 2 *Seld.* 522 ; *Furman* agt. *Mayor*, *&c. of N. Y.* 5 *Seld.* 567.)

The whole river included within high water mark on each side, was a public highway, and the act evinces no intention on the part of the legislature to relinquish any of the public rights in the river bed to the New York and Harlem Railroad Company. The pretensions they make would justify the claim to construct a dock or wharf out into the navigable waters.

No such intention can be inferred, and the rule of construction negatives it. (*Keen* agt. *Stetson*, 5 *Pick.* 492 ; *Gould* agt. *H. R. R. R. Co.* 12 *Barb.* 616 ; *S. C.* 2 *Seld.* 522.)

2. The permission given them by the common council was

upon condition that they should only act under the direction of the street commissioner (*page* 7, *of Case in first suit*). No such obedience to his authority, or action under his superintendence is pretended. This condition precedent ought also to have been literally complied with. (4 *Kent's Com.* 125; 1 *Greenl. Cruise*, 481; *Vanhorne* agt. *Dorraine*, 2 *Dall.* 317.)

V. If the New York and Harlem Railroad Company had any right to extend their railway beyond the point designated by the act of 1849 (to wit, the then existing margin of the East river), and to follow the accretions of the shore or change in the margin of the river, their right was subservient to that which had been conferred upon the grantees, and these plaintiffs, their assignees of the franchises granted by the act of 1860, chapter 512.

1. These plaintiffs were prior in grant.

(*a*) Although the act of 1849 (*chap.* 75), authorized the Harlem Company to construct a branch to the East river at such point as might be designated or permitted by the corporation of the city of New York, that authority was inchoate and without legal existence until performance of the condition precedent. Until such designation and permission had been made and given by the corporation, which did not occur till March 8th, 1864, the right or interest could not be " claimed or vest." (4 *Kent's Com.* 125; 1 *Greenl. Cruise*, 481; 2 *Dall.* 317.)

(*b*) The legislature had previously by the act of 1860 (*chap.* 512), specifically granted this right of location for railroad purposes in this part of Thirty-fourth street which is now held and owned by the plaintiffs (in the first suit), and the right was first exercised by them.

2. By express repeal of any existing rights of the New York and Harlem Railroad Company, in conflict with those conferred by the act of 1860.

Any rights of that company, conferred by charter or by the act of 1849, were subject " to alteration, modification and repeal." (*Const. art.* 8, § 1; *Act of Incorporation, chap.* 262, *Laws of* 1831; 1 *R. S.* 600; 8 *Barb.* 358; 14 *Id.* 559.)

NEW YORK PRACTICE REPORTS. 205

Dry Dock, &c., Railroad Co. agt. The N. Y. and Harlem Railroad Co.

So far as these rights of location of railroad tracks in this part of Thirty-fourth street were concerned, the 4th section of the act of 1860 expressly repealed the ambulatory privilege of location conferred by the act of 1849, and all rights of that company, inconsistent or irreconcilable with the grant of 1860. (*Moore* agt. *Westervelt,* 3 *Sandf.* 765; *Livingston* agt. *Harris,* 11 *Wend.* 329; *Laws of* 1860, *p.* 1041.)

3. Effect can only be given by the court to the manifest intention of the legislature, as expressed by the act of 1860, by protecting the plaintiffs (in the first suit) in "constructing, maintaining and operating" their road over the route in question, as against all others; and if, as defendants allege (*page* 16); "there was no room for more than one set of double tracks," or (*page* 17) "it was utterly impossible to locate a railroad to the ferry in any other place than the location selected," the act of the common council, if designed to allow the privilege claimed, or to interfere with the existing rights of the plaintiffs (in first suit) as then possessed, was little less than a fraud.

Judge MILLER has entirely misapprehended the relative rights of the parties in the *locus in quo*, and given a preference to the wrong doer.

VI. The pretensions of James M. Waterbury and the East River Ferry Company, to any right of possession or ownership in the bed of Thirty-fourth street east of First avenue, or to an injunction restraining these plaintiffs from exercising their franchises over the street, as granted by the legislature, are wholly untenable.

1. The corporation of New York never had any title to any part of the premises claimed, beyond four hundred feet from high water mark (*Chap* 58, *Laws of* 1826).

2. The whole space in Thirty-fourth street east of First avenue, in extension of the lines of Thirty-fourth street, west of First avenue to Avenue A, had been dedicated by the corporation, and adopted by the legislature, as and for a public street.

(*a*) The title of the corporation of the city in the land conveyed them by the act of 1827, chapter 58, and which

they retained therein after the deed of the Farmers' Loan and Trust Company, was held merely *publici juris*, and subject to the direct action of the legislature. (*The Mayor* agt. *Scott*, 1 *Caines*, 543 ; *People* agt. *Kerr*, 27 *N. Y.* 188 ; *Darlington* agt. *The Mayor, &c. of New York*, 31 *N. Y.* 164.)

(*b*) The act of thus laying it out as a public street, was within their statutory powers. (*Laws of* 1787, *chap.* 61, § 2 [*Davies' Laws N. Y. p.* 381] ; *Act of April* 3, 1798, §§ 1, 2.)

(*c*) Even if private owners, their acts amounted to a dedication of Thirty-fourth street east of First avenue, as a public street, and they could not obstruct the public passage to the water. (*See deed to the Farmers' Loan and Trust Company ; Matter of Thirty-ninth street*, 1 *Hill*, 191.)

The street by operation of law was extended to the water (*People* agt. *Lambier*, 5 *Denio*, 9).

(*d*) Its use by the public as a public highway is uncontroverted, and its recognition and adoption as a public street, is complete in the statute of 1860, chapter 512.

2. The Farmers' Loan and Trust Company took no interest or title in the street under their deed from the corporation, which expressly limited the premises granted by the sides of the street (*Wetmore* agt. *Law*, 34 *Barb.* 515).

3. James M. Waterbury and the East River Ferry Company, the plaintiffs in the second suit claiming under them, have no rights in Thirty-fourth street, which are the subject of protection by injunction.

(*a*) Although they together claim to own the block south of Thirty-fourth street, and one hundred feet square on the south-east corner of the block north of Thirty-fourth street by no rule of apportionment of the covenant, were they bound to "fill in, regulate or grade" Thirty-fourth street beyond the middle of the street, nor can either be held to any obligation or duty as to any portion of the north half of the street except in front of the exterior, one hundred feet adjoining the bulkhead line far east of the part of the street on which these plaintiffs (in first suit) have laid their road.

(*b*) They cannot appear to assert the rights of the corpo-

ration of the city of New York. (*See opinion in N. Y. and H. R. R. Co. agt. The Forty-second and Grand street Ferry R. R. Co. N. Y. Transcript, June* 27, 1864.)

(*c*) Neither of them (except Waterbury, as to about one hundred feet on the north-west corner of the block south of Thirty-fourth street) had any title. Beyond that, the premises claimed lay outside of the four hundred feet from low water mark, as granted by chapter 58, of laws of 1826, and belong to the state. (*See map on scale* 100 *feet to inch.*)

(*d*) They have no property or private rights in Thirty-fourth street. They were at most subject to the duty of filling, regulating and grading the street when specially notified and required. They were not tenants (by any kind of title) of any portion of the street. They were not in any sense, in possession of, or even squatters on any portion of the street east of First avenue, on which these plaintiffs had laid their railroad; it was uninclosed, and thrown open to public use, and has been ever since used for public passage, and they had no peculiar or exclusive possession or control over it.

(*e*) No requisition had been made on them by the corporation to fill in the street, so that the time prescribed by the covenant in the deed to the Farmers' Loan and Trust Company had begun to run, and no danger of a forfeiture could be apprehended, or was alleged. They had been over a year engaged in filling in this street, it is to be presumed for their own gain, in pretending to allow deposits of earth upon it; but their claim to an indefinite, or any exclusive possession of the street for progressing in this work of filling in, regulating and grading it, or constructing a sewer in it at their convenience and pleasure, or "until the city authorities shall fix and determine the grade line," is preposterous. Even if they were interfered with, this constitutes no trespass or taking of private property, whatever might be the obligation resting on the grantees of the corporation, under the deed of January 29th, 1847.

(*f*) But instead of acting under and in compliance with the covenant of the deed under which they claimed, their

acts were in direct violation of it (*Case, second suit, fol.* 99, § 116).

*(g)* Such interference with the execution of the condition subsequent, as might follow from executing the enactments of the statute of 1860, authorizing the laying and construct-ing of the railroad of these plaintiffs (in the first suit), fur-nished a full justification *pro tanto*, for any breach of these covenants, to the extent occasioned by carrying out those provisions. (*People* agt. *Manning,* 8 *Cow.* 297 ; *Whitney* agt. *Spencer,* 4 *Cow.* 39 ; *Carpenter* agt. *Stevens,* 12 *Wend.* 589 ; *People* agt. *Bartlett,* 3 *Hill,* 570.)

*(h)* The statutory powers conferred upon the plaintiffs (in the first suit) to construct a railroad and exercise a public franchise over the street, and the repeal of all inconsistent acts, overrode all privileges or duties the corporation might have allowed to or prescribed for private persons in the streets, in derogation of the rights thus conferred by the legislature.

*(i)* They had no right in the street as against these plain-tiffs, which ought to be protected by injunction, and no ground for interference by that process is shown. The act complained of, even if unjustified by the act of 1860, was at most a pure trespass. (*Hart* agt. *The Mayor, &c.* 9 *Wend.* 580 ; *Jerome* agt. *Ross,* 7 *Johns. R.* 315.)

*(j)* No insolvency of the defendants was alleged, and no reason for invoking the peculiar jurisdiction of a court of equity was shown or established.

VII. The right of the plaintiffs (in the first suit) " to construct, maintain and operate," their railroad, in and through Thirty-fourth street, in the manner prescribed by the act of 1860, chapter 512, and of exercising the franchise as thereby authorized, having been wrongfully interfered with, and their possession interrupted and usurped by the defendants in the first suit, a case is presented affecting property of a peculiar character and value, the very sub-stance and usefulness of which is affected by acts tending to its destruction in the only character in which it can be enjoyed; for this no due recompense could be made, and

the case called for the interposition of the court by injunction in their favor. (*President, &c. of N. and C. Turnpike Co.* agt. *Miller*, 5 *Johns. Ch.* 101; *Hud. and Del. Canal Co.* agt. *N. Y. and E. R. R. Co.* 9 *Paige*, 323; *Livingston* agt. *Van Ingen*, 9 *Johns. R.* 507.)

VIII. The orders in each of these cases should be reversed with costs; the injunction in the first suit should be continued as prayed for, and the injunction in the second suit should be dissolved.

A. J. VANDERPOEL, *counsel for ferry company and Oliver Charlick.*

The same facts from which the parties seek to draw the legal conclusions for which they respectively contend appear in each of the causes.

If the injunction asked for in the first entitled suit is granted, it follows as a necessary consequence that the injunction asked for as against the ferry company and Mr. Charlick, in the second entitled suit, must be denied.

The point insisted upon on behalf of the ferry company and Mr. Waterbury, is that in the present condition of things, neither of the railroad companies have any right to enter and lay down their rails, and run cars over the disputed territory.

I. The ferry company and Mr. Waterbury, are lawfully in possession of the space one hundred feet wide, extending easterly from First avenue to bulkhead line.

They are engaged in filling the land, constructing a sewer by and under direction of the Croton Aqueduct Department, and preparing to grade and pave the space, so soon as the city authorities shall fix and determine the grade lines which the ferry company and Mr. Waterbury must conform to when established.

II. While the work is in progress, the ferry company and Mr. Waterbury are entitled to the possession and control of the premises, and an interference by either of the railroad companies, while that possession and control continues, can-

210 NEW YORK PRACTICE REPORTS.

Dry Dock, &c., Railroad Co. agt. The N. Y. and Harlem Railroad Co.

not find a sanction or apology in any act of the legislature or resolution of the common council.

The zeal of the railroad companies in the struggle for priority of location, has blinded them to the rights of the city, and its grantees and covenantees. Neither company would have dreamed of asserting a right to enter and lay down its rails in the present condition of the land, except for the knowledge that the occupation by the one company will necessarily exclude the other, if any regard is paid to the rights and franchise of the ferry company secured to it by the lease from the city.

III. It probably was the design of the mayor, aldermen and commonalty, when making the contract with the Farmers' Loan and Trust Company, to dedicate the space of one hundred feet wide to the purposes of a public street, when the same was filled in and regulated and paved. It was no part of the contract, however, that while the work was in progress the contractor should be subjected to an interference by or on the part of the public generally, or by a railroad company subjecting it to its use, thus largely increasing the expense of the work, and the length of time requisite for its performance. The time when the dedication to the public use should take effect, so far as to give the public a positive right of use and enjoyment, was one in which the grantees had a large pecuniary interest.

Until adapted for public use as a street, and the grantees were released from their covenant to prepare it for a street, avenue or wharf, the question of dedication was one in which only the corporation and its grantees had an interest. Any grantee or sub-grantee could insist that the corporation should be held to its agreement to make it a street.

As it now stands, it is no more a public street than if the agreement had been that after ten years from the date of the deed, the corporation would throw open this land for a street. It could not be contended that before the ten years elapsed, it was competent for the public to assume the use.

The mere mapping out a street in the city of New York, does not give the public a right to enter upon and use it.

The map under the act of 1807, extended Eleventh street from Broadway to Fourth avenue. But the public had no right as against the owner, to enter upon it and use it until compensation should be made to the owners of the land, and before an actual dedication of it; or in other words, a right to it by user had been acquired by the public, the legislature in 1845 closed it.

IV. Assuming that the act of April 3d, 1798 (*Laws of* 1798, *p.* —), is in force, as contended for by the counsel for the Dry Dock Railroad Company, which allows and empowers the mayor, aldermen and commonalty, to extend streets over the lands reclaimed from the rivers, it cannot aid the railroad companies in their claim that the space at the foot of Thirty-fourth street east of First avenue, has become a public street, for there is no pretense that as to this land the mayor, &c., have acted under that statute. They have not attempted to exercise any of the powers conferred by that act—but their deed and contract is to be judged as it would be if executed by a private individual.

V. The fact that the grant under which the Dry Dock Railroad Company claim to lay down their road over this space, authorizes them to go through Thirty-fourth street to Avenue A, and down Avenue A to Fourteenth street, may be of interest as an illustration of reckless legislation, but gives them no power to enter upon the premises in question.

There are no such points known to the law as Thirty-fourth street east of First avenue, or as Avenue A, above Twenty-fifth street, except above Fifty-second street. That part of the grant is a dead letter.

In 1807 (*Laws p.* —; *Valentine's Laws, p.* —; *Davies' Laws, p.* 431), commissioners were appointed to lay out the city of New York north of a certain line, and prepare a plan and file a map of the streets, &c., which plans section 8 declares, " shall be final and conclusive."

The work was completed, the maps were filed—and are known as " Randal's Maps."

These maps are referred to in the subsequent legislation relative to the plan of the city.

On this map Thirty-fourth street extends to the high water mark on the East river; Avenue A extends as far north as about Fourteenth street, to the shore of the East river, (where a bay commences), and disappears for the space of a mile and a half northward, where it reappears above Fifty-second street, at the same distance easterly from First avenue (over six hundred feet), as it is below Fourteenth street. So that on the map there is nothing indicating streets by the name of Thirty-fourth street or Avenue A, through or over Kipp's Bay.

What use would be made of the land which might be reclaimed from Kipp's Bay, by filling or otherwise, was left for future determination. Instead of conveying it to the Farmers' Loan and Trust Company, the city could have covered it by a market, or built bulkheads at First avenue and run out piers. There is no warrant for the suggestion that as the waters in front of the street were filled up, streets were to be opened in continuation of those on the upland, and that the same names were to be applied.

As illustrations : On the map the commissioners designated a space between One Hundred and Sixth and One Hundred and Ninth streets, from East river to Fifth avenue, as Harlem Marsh ; Avenue A, First, Second, Third and Fourth avenues, extending to the marsh on the north and on the south, but were not continued through it, and in 1837, as these lands were being reclaimed, it was found necessary to go to the legislature and obtain the passage of an act altering the plan of the city, by continuing and extending the above avenues from One Hundred and Sixth to One Hundred and Ninth street. (*Laws* 1837, *ch.* 274, *p.* 291 ; *Davies' Laws*, 800 ; *Valentine's Laws*.)

So in 1837, the map was altered by laying down thereon Thirteenth avenue. It was to be reclaimed from the waters of the North river. The legislature at the same time deemed it necessary to provide that the several cross streets, as laid out on the map or plan, should be continued from their present termination (the water's edge), on the map or plan, on their present lines to Thirteenth avenue. (*Laws* 1837,

*ch.* 182, *p.* 166; *Davies' Laws*, 799; *Valentine's Laws*, *p.* —.) By the same act Eleventh avenue was continued in a direct southerly line from its termination on the map, Thirty-third street, to Nineteenth street. So our session laws have many similar acts.

These laws would be wholly unnecessary if the theory of the Dry Dock Company was correct, that the streets and avenues are by law continued over the made land, on the same lines and by the same names as those on the upland. As to Avenue A, we have a legislative enactment to the effect that it does not extend across Kipp's Bay. (*Laws of* 1824, *ch.* 10, *p.* —; *Davies' Laws*, 656; *Valentine's Laws*.)

The language is, "short avenues have been laid out by the said commissioners, severally called and designated on the said map or plan, by the names of Avenue A, Avenue B, Avenue C, and Avenue D, all terminating in the waters of the East river, within a short distance of their commence-ment."

The act of April 27th, 1860, passed ten days after the Dry Dock Railroad grant, making it illegal to fill up lands outside of the bulkhead line, is a complete answer to the suggestion of the counsel for the Dry Dock Company, that the legislature meant to recognize certain spaces near the foot of Thirty-fourth street, as continuations of Avenue A, and Thirty-fourth street (*Laws* 1860, *p.* 1063).

VI. By the act of 1826, the title to all the lands four hundred feet east of low water mark, on the shore of the East river, was vested in the mayor, aldermen and commonalty. The only limitation on this title was the pre-emptive right of proprietors of land under water. It is thus apparent that it was contemplated that this land would be sold by the mayor, aldermen and commonalty. In the *Furmans*, the court of appeals affirmed the absolute ownership of the mayor, &c., to the lands under water, with the right to sell all or any part of the same, at such times and at such prices as it might deem expedient (*Furman* agt. *The Mayor*, 10 *N. Y.* 567).

VII. It would be useless to discuss the question whether

the title which the city of New York has to property not acquired under the act of 1813 (relative to the compulsory opening of streets and avenues, or lands dedicated to public use as streets by adjoining owners), is an interest which is at all times held only subject to the will of the state legislature ; in other words, whether the city of New York owns any " private property," in the sense in which those words are used in the constitution.

This land reclaimed from the water, is private property, within the meaning of the 178th section of the act of 1813, relative to street openings. That section places the mayor, aldermen and commonalty, as to its lands which may be required for a street, or benefitted by the opening, upon the same footing as an individual owner. And when the lands of the mayor, aldermen and commonalty are taken under that statute, they hold them in trust under a new title—no power of sale remains. They are to be held as public streets forever. (*Laws* 1813, *vol.* 2, *pp.* 409, 415 ; *Davies' Laws,* 535 ; *Valentine's Laws.*)

VIII. The papers on our behalf negative, and it is not affirmed on behalf of the railroad companies, that any action has been taken to open Thirty-fourth street east of First avenue, nor Avenue A, and there is no act of the legislature which interferes with the title to these lands as granted to the city by the act of 1826.

The legislature have not said that there should be a street east of Thirty-fourth street and First avenue, nor whether, if there is to be one, it should be continued on the present lines, or should diverge to the north or south.

Suppose the Farmers' Loan Company and its grantees should now agree with the mayor, aldermen and commonalty; to exchange the one hundred feet space on the present line of Thirty-fourth street, for the adjoining one hundred feet on the south ; who could raise or interpose an objection ? Who could object to the common council giving to this space taken in exchange a name other than Thirty-fourth street ? What then would become of this right which the Dry Dock

Railroad Company assert under their grant, to run over the one hundred feet as at present filled out?

IX. If we assume for the purpose of the argument, that this space of one hundred feet wide, is within the line upon which the railroad companies are authorized to run them, we claim that they have no right to enter upon this space of one hundred feet wide without making compensation to the city, and to the grantees who have entered into covenants to fill it up and keep it in repair.

We shall leave it to the counsel for the railroad companies to reconcile if they can the principles of the recent decisions of the court of appeals, as applied to the interest of the city, in those streets opened under the act of 1813, and those which have been acquired by grant, to be used only as such. Our case is outside of those decisions.

1. As to the right of the city to compensation. If the legislature in defining the route of these roads, had directed them to go through an engine house, or one of the houses which the city owned and leased to tenants on Chatham street, it would, we think, be pretty difficult to convince a court that compensation was not to be made for the land taken.

The Dry Dock Railroad charter, which defines the route, provides for making compensation for obtaining any real estate or interest therein, which may be required (§ 3).

Any real estate for which compensation was to be made to the mayor, aldermen, &c., under the act of 1813, when taken for a street, is real estate for which compensation must be made, within the meaning of section 3, above referred to.

The same remarks apply to the Harlem company.

The grantees of the corporation can defend their possession and right to the space one hundred feet wide, until this compensation is made. The railroad companies have no right to interfere until compensation is made to the owner.

2. The Ferry Company and Waterbury, as covenantees, have an interest in this space, for which they are entitled to compensation.

It is suggested by the counsel for the Dry Dock Company,

that under the thirteenth section of the general railroad act (*Laws of* 1850, *p.* 215), that compensation is only to be made to the owner of real estate—however that may be (which we will not concede), the grant to the Dry Dock Railroad Company uses very different language : "And should any real estate, or interest therein, be required for the purpose of constructing," &c., the act points out how that interest is to be compensated for. The same section shows how carefully the rights and interests of others were intended to be guarded—for in order to cover the doubt whether the use of the rails of another company would come under the head of an interest in real estate, express provision was made to cover it.

Our duty to fill in and our duty to repair, is a matter of private contract, while intended to attain a similar end ; it is outside of the laws and principles of public taxation.

The state legislature cannot pass a law which shall make that duty more onerous, without securing to us a just and fair compensation. Whether it is to be much or little, the law has prescribed a mode for its determination.

Nor will the fact that the legislature may make it more difficult and expensive to comply with our contract, relieve us from it.

The rule is, that which the law renders impossible, need not be performed. "*Lex non cogit ad impossibilia*," is the maxim, and the word *impossibilia*, receives a strict construction (*Broom's Leg. Max.* 181).

X. The Ferry Company is entitled to compensation for injury to its franchise. The character of its business, and the injury which it must sustain by the appropriation of the street (if it be a public street), are detailed fully in the affidavits interposed by the Ferry Company and Harlem Railroad Company.

This ferry franchise is a contract, the value of which cannot be impaired by legislative action.

XI. The railroad companies had no right to convert this space into a railroad depot.

XII. The Dry Dock, East Broadway and Battery Rail-

road Company cannot exercise any corporate rights as assignees of the grant, as against the Ferry Company or Mr. Waterbury.

This company is organized under the general railroad act of 1850 (*p.* 211). This act prohibits the companies organized under that act from constructing their road upon or across any streets in any city, without the assent of the corporation of such city (*page* 224, § 28, *sub.* 5).

This artificial person cannot take a title or exercise a right in hostility to the act which created it (*Angel & Ames on Corporations,* 82 *to* 86).

XIII. These railroad companies have no right to enter upon the premises in question; the proper remedy is by injunction. They create a nuisance for which there is no legislative sanction until compensation has been made. Every entry to lay down the road, every time a car enters upon this ground, a new and distinct trespass is committed, and a new cause of action arises, for which suit can and must be brought; so often as a car passes, the employees on the lines are prevented from work, and there is an almost constant repetition of this disturbance.

It would be strange indeed, if in such a case an injunction is not the appropriate remedy.

XIV. The injunction at the suit of the Dry Dock Railroad Company, if their right on the main case could be sustained, cannot be held against Mr. Charlick.

XV. The motion to vacate the injunction granted at the suit of the Ferry Company and Mr. Waterbury, should be denied, and the injunction as granted at the suit of the Dry Dock, East Broadway and Battery Railroad Company, should be vacated. All interference on the part of the Ferry Company, and Waterbury and Charlick, with the rails of the Dry Dock Company, is denied.

C. A. RAPALLO, *counsel for New York and Harlem Railroad Company.*

I. By the act of March 6, 1849 (§ 3), the New York and Har-

lem Railroad Company is authorized to construct a branch of its road from any point north of Twenty-seventh street to the East river, at such point as may be designated and permitted by the corporation of the city of New York.

By the resolution of the common council, dated March 8, 1864, the company is permitted to extend its road through Thirty-fourth street to the East river.

The right of this company to continue its track through Thirty-fourth street to the East river, is, therefore, unquestionable.

II. The filling in and extension of Thirty-fourth street beyond the point where it terminated at the time of the passage of the act of 1849, does not deprive the Harlem Company of its right to extend its tracks to the river. The act does not purport to restrict the company to the line of the river bank as it existed in 1849, but it gives a general power to extend to the river itself, and does not limit the time of making the extension. The intent is apparent that the railroad should connect with the river, and that connection is the essence of the privilege granted.

III. That part of Thirty-fourth street which lies east of First avenue, not being laid down on the commissioner's map, and not having been opened as a public street, remains the property of the corporation of New York, and its consent is sufficient to authorize the Harlem Company to lay tracks thereon, and until opened as a public street the plaintiff had no right to enter upon it without the consent of the corporation.

IV. If both companies were entitled to lay their tracks on the premises in dispute, the injunction was properly refused, for the Harlem Company had the first grant of the privilege, and it appears by the affidavits that the Harlem Company first selected the center of the proposed street as the location for its tracks.

The plaintiff, therefore, had no right to drive it from that location. (*See affidavit of W. H. Vanderbilt, fols.* 48, 51, 53; *also of Thos. J. Brown, fol.* 94.)

V. The allegation that the Harlem Company broke up

and destroyed the tracks, &c., laid by the plaintiff, and laid rails, &c., in their place, and upon the ties of the plaintiff, is fully met and denied in the opposing affidavits; and the judge who decided the motion must be deemed to have found for the defendant on that issue. (*See affidavits of W. H. Vanderbilt, fols.* 70, 71; *Thos. J. Brown, fols.* 98, 99, 106; *W. P. Craig, fol.* 109; *O. Charlick, fol.* 142.)

VI. These affidavits show that the aggression was wholly on the side of the plaintiff.

VII. The plaintiff has no right to lay its tracks on the premises in dispute, and, therefore, is not entitled to question the right of the Harlem Company.

1. If the premises in dispute are to be regarded as a public street, the plaintiff by becoming incorporated under the general railroad act of 1850, has subjected itself to the prohibition contained in subdivision 5, of section 28 of that act.

2. But the premises in question are not a public street, and the authority conferred by the act of 1860 cannot be exercised until such premises are open as a public street.

3. The authority conferred by the act of 1860, is a mere right of passage through Thirty-fourth street to Avenue A, and through Avenue A. At the time of the passage of the act of 1860, neither Thirty-fourth street nor Avenue A, at the points in question had any existence, either in fact or in law. The act, therefore, could not take effect until those streets were made and thrown open to the public. Avenue A at Thirty-fourth street, is still part of the East river, and outside of the bulkhead line.

The right to make a terminus at the foot of Thirty-fourth street, is not granted by the act of 1860.

The order appealed from should be affirmed, with costs.

*By the court,* SUTHERLAND, J. When the Dry Dock, East Broadway and Battery Railroad Company commenced constructing and extending their tracks in and through Thirty-fourth street, or the strip of land one hundred feet wide, to a point about two hundred and seventy-seven feet easterly from the easterly side of First avenue, I understood

from the papers in this case, that Thirty-fourth street, or the strip of land between the three easterly termini of the New York and Harlem Railroad tracks in Thirty-fourth street and the place to which the ferry house had been removed, and where it then was, had been so far filled out and graded, as to be constantly used by the public in going to and from the ferry, and for common highway purposes generally. This being so, and considering other undisputed facts and circumstances of the case, I cannot see why either of the railroad companies had not then a right as to Waterbury and the Ferry Company, to construct and extend their tracks through and over Thirty-fourth street, or the strip of land between the points last mentioned, as far easterly as the grading or the condition of the street or strip of land would permit. The legal title to the strip of land was not in Waterbury and the Ferry Company, or either, and neither had any beneficial interest in the soil thereof. Considering the then devotion of it to public use, I do not think it sufficiently appeared that the devotion of it to an additional public use, by the construction and operation of a railroad or railroads upon or through it, would appreciably injure either Waterbury or the Ferry Company, by interfering with the filling up or the grading, or the construction of the sewer, to authorize the injunction at their suit on the ground of such interference. It appears to me that the Ferry Company must be actually benefitted by the extension of either railroad, or both. Moreover, the ability of either railroad company to pay any damages that might be recovered in an action at law for any possible injury to Waterbury and the Ferry Company, or either, by or from such claimed or supposed interference, is not questioned, considering that all railroads must be deemed to be constructed and operated for public use. I do not think the injunction at their suit ought to be sustained, even if we could see that by or from such interference they might suffer some slight damage or inconvenience. I think the injunction at the suit of Waterbury and the Ferry Company,

restraining the Railroad Company, should be vacated, with costs.

As to the question between the two railroad companies, I assume and think that before the Dry Dock, East Broadway and Battery Railroad Company actually commenced locating, constructing and extending their tracks in and through Thirty-fourth street, or the strip of land one hundred feet wide, both or either of the railroad companies had the right, as between each other, to extend their tracks easterly in or through Thirty-fourth street or the strip of land to the ferry, or as far as the grading and condition of the street or strip of land would permit. Before the Dry Dock, East Broadway and Battery Company actually commenced taking a qualified possession of the center or middle of that part of Thirty-fourth street, or the strip of land, by locating and constructing their extension, I do not see why either railroad company had not a right to make their extension through or along the center or middle of the street or strip, to the exclusion of the other from that particular location. I do not see upon what principle this court could have favored the right of either company thus to locate their extension, to the exclusion of the other, before any actual attempt at such location. But I think that the Dry Dock, East Broadway and Battery Company, by first actually taking a qualified possession of the center or middle of the street or strip of land, by locating and constructing their extension as far as they did, until interfered with by the agents or servants of the other railroad company, acquired the right to complete the construction of, and to operate their extension to the ferry, or as near to it as the condition of the street or strip, and the convenient operation of the ferry would permit, to the exclusion of the right of the other company to interfere in any way with the construction or operation of the Dry Dock, East Broadway and Battery extension, as thus located. I have carefully examined the question between the two railroad companies, and can see no other principle or ground upon which we can put our decision. I do not think that the circumstance that the New York and Harlem Railroad

Company, or its officers or agents, intended to further extend their tracks through the center or middle of the street or strip of land, and had the ties and other materials for such extension, or the circumstance that such intended extension through the center or middle would be more convenient for them in the construction or use, because their tracks east of First avenue, which had been constructed some time before the other railroad company commenced locating and constructing their extension in the center or middle of the street or strip, ran through and terminated in the center or middle of this street or strip, did or could affect or impair the right of the Dry Dock, East Broadway and Battery Company first to actually locate and commence constructing their extension as they did.

The order in this action between the railroad companies, and in which Oliver Charlick and the Ferry Company are parties defendants, should be reversed, and the injunction which was vacated by it, restored and continued, with costs to the plaintiffs, to be paid by the New York and Harlem Railroad Company.

BARNARD, P. J., concurred.

CLERKE, J. dissenting.

---

## SUPREME COURT.